OPINION
{¶ 1} Plaintiff, Christopher E. Kulas, appeals from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendant, Bank One Trust Company, N.A., on plaintiff's breach of contract claims and on defendant's counterclaim for unjust enrichment.
{¶ 2} Plaintiff began working for defendant on December 1, 1994, as a salesperson for corporate trust products and document custody services. He was eventually promoted to Managing Director of Corporate Sales Services. In that capacity, he both managed a team of sales people and continued to market the bank's corporate trust products and document custody services.
{¶ 3} Shortly after plaintiff began his employment, defendant established a plan that paid plaintiff and other affected sales executives and managers incentive compensation, in addition to the base salary, based upon a percentage of projected fees on new business brought into the bank. Defendant established a new incentive compensation plan at the beginning of each calendar year, the terms of which were typically announced to the affected sales executives and managers at the annual off-site meeting. In addition, written copies of the incentive compensation plans were available upon request. The incentive compensation plans were never negotiated individually or attested to by the affected sales executives and managers.
{¶ 4} Under the 1996 Institutional Market Sales Executive Compensation Sales Incentive Plan ("1996 Plan"), incentive awards were calculated based upon a percentage (40 percent) of revenue generated above a threshold amount of $150,000. In addition, sales executives were entitled to receive "trailer" commissions for the second and third year of a qualifying transaction. When the 1996 Plan was implemented, there was no limitation on the amount of commission a sales executive or manager could receive on a single transaction.
{¶ 5} The 1996 Plan included the following pertinent provisions:
{¶ 6} "* * * Participation privileges for this plan are granted to Sales Executives * * *. Participation may be revoked, at any time, by the Corporation.
{¶ 7} "* * *
{¶ 8} "DEFINITIONS
{¶ 9} "`Participant' shall mean an employee designated by Institutional Sales Group Head as eligible for an award in accordance with the provisions of this plan. * * * [N]o employee of Banc One Corporation, it's [sic] subsidiaries or affiliates has a right to participate in this plan, even though they may have participated in prior years.
{¶ 10} "* * *
{¶ 11} "POINTS OF UNDERSTANDING
{¶ 12} "* * *
{¶ 13} "`Sales Credit and Verification' To receive an award under this plan, all fees must be verified using a method established by management. * * *
{¶ 14} "* * *
{¶ 15} "`Award Payments' * * * All payments are subject to approval by the Senior Managing Director of Sales and the Investment Management Compensation Committee.
{¶ 16} "* * *
{¶ 17} "`Interpretations/disputes' Final decisions regarding disputes, interpretations or matters not specifically addressed in this plan will be the responsibility of the Institutional Market Sales Head or the Senior Managing Director of Sales and the Investment Management Compensation Committee. Sales Management reserves the right to review the material influence an individual sales executive has on a specific new account. In instances where significant internal factors, other than the sales executive's influence, contributed to the sale of a new account, Sales Management may award the sales executive involved all or partial credit depending upon the circumstances involved.
{¶ 18} "ADDITIONAL PLAN PROVISIONS
{¶ 19} "* * *
{¶ 20} "`Right to Terminate, Amend or Modify' At any time this plan may be modified, amended, [or] terminated. No amendment, modification, or termination of the plan, shall in any manner adversely impact any award therefore earned under the plan. Such amendment, or termination may be made without consent of the participants. The existence of the plan does not obligate the Institutional Sales Group Head or the company to pay an award to any participant (or beneficiary), nor does any participant (or beneficiary) attain any vested right to an award until the award has been finalized and approved for payment."
{¶ 21} In 1995, plaintiff began discussions with representatives from Chase Manhattan Bank ("Chase") to secure Chase's document custody business. Discussions continued into 1996, and in the spring of 1996, a tentative agreement was reached. Because management, including plaintiff's supervisor, Geoffrey von Kuhn, held some reservations about the deal, the contract was not approved by defendant until December 1996. According to von Kuhn, management could have refused to enter into the contract at any time prior to the time it was approved in December 1996. On December 16, 1996, a formal contract between defendant and Chase was executed. According to plaintiff's projections, the Chase transaction would generate $3 million in fees for defendant. After the contract was executed, plaintiff submitted sales tickets detailing the estimated revenue and requesting his commission on the deal. Plaintiff expected to receive $1.25 million dollars in incentive compensation under the 1996 Plan.
{¶ 22} However, plaintiff received only a total of $500,000 on the Chase deal. According to von Kuhn, the 1996 Plan was modified in May 1996 to include the following provision: "Any single transaction for the plan year closed after July 1, 1996 will be limited to a payout amount of $500,000. This single payout limitation does not capitate the total payout that a participant may be eligible for based on total year production." According to von Kuhn, the modified 1996 Plan capping compensation at $500,000 on a single transaction was imposed in response to previous transactions which had generated large commissions for sales executives and was not imposed for the specific purpose of limiting plaintiff's compensation on the Chase deal. It was further noted by von Kuhn that all sales executives and managers, including plaintiff, were orally informed of the modified 1996 Plan at the time it was implemented. In addition, written copies of the modified 1996 Plan were distributed to all sales managers, including plaintiff, for distribution to the sales force. Further, von Kuhn specifically discussed with plaintiff the impact of the modified 1996 Plan on the Chase transaction. The modified 1996 Plan became effective July 1, 1996, and remained in effect until the end of the calendar year. Thus, pursuant to the modified 1996 Plan, plaintiff's compensation on the Chase deal was capped at $500,000 because it did not formally close until after July 1, 1996.
{¶ 23} In December 1996, Mike Daniel, Product Manager for Document Custody Services, was responsible for verifying the reasonableness of estimated revenues reported on submitted sales tickets. Just prior to the time the Chase deal formally closed, Daniel proposed that payment of plaintiff's compensation be deferred and made in two $250,000 installments after it was clear that the transaction achieved certain profitability margins. According to Daniel, management was skeptical about the profitability of the transaction and had serious concerns about the large compensation payout. In fact, according to von Kuhn, the Chase deal would not have been approved had plaintiff not agreed to accept payment in two separate installments.
{¶ 24} In August 1996, John Noel assumed responsibility for sales tracking and incentive compensation calculations and payments. In February 1997, Noel paid plaintiff the first $250,000 installment. The second installment was paid in November 1997. In February 1998, Noel paid plaintiff a "trailer" payment of $93,379 on the Chase transaction. According to Noel, the "trailer" payment was made in error because Noel did not understand that the $500,000 cap pertained to all incentives for accounts sold, including "trailer" payments. Noel did not discover the error until he was making final calculations of plaintiff's compensation in conjunction with the elimination of plaintiff's position in November 1998.
{¶ 25} According to plaintiff, he was never informed that the 1996 Plan had been modified and never received a copy of the modified plan. He was informed, however, that the 1997 Institutional Market Sales Executive Compensation Sales Incentive Plan contained a $500,000 cap on compensation and that the cap included "trailer" payments. He was originally informed that the $500,000 cap was to be instituted in 1997 and would not affect any deals closed in 1996. Accordingly, he submitted sales tickets on the Chase deal, expecting to be paid $1.25 million dollars plus second and third year "trailer" payments under the 1996 Plan. In December 1996, however, von Kuhn informed him that his compensation would be capped at $500,000 on the Chase deal and that he would be paid the sum in two separate $250,000 installments. Plaintiff objected to the cap and the method of payment, but was told that the decision was final.
{¶ 26} In 1998, defendant established its 1998 Institutional Asset Management Sales Groups Sales Player/Coach Incentive Plan ("1998 Plan"), which included many provisions similar to those in the 1996 Plan, including those regarding plan participation, award eligibility, and plan amendment, modification and termination.
{¶ 27} In early 1998, defendant acquired the book of business of Bank of Boston and Merchantile Bank, which included the document custody business of five financial institutions. According to Daniel, the newly acquired document custody agreements were open-ended, which meant that they could be terminated after a 60-day notice. Accordingly, there was no guarantee that the newly acquired document custody customers would either continue to do business with defendant as a successor custodian after the acquisition or would grant any future flow business to defendant. According to both Daniel and von Kuhn, plaintiff was responsible for cross-selling additional business not already provided by defendant as of the date of the acquisition. Moreover, plaintiff was informed on numerous occasions that he would not be eligible for incentive compensation payment on the existing files obtained as part of the acquisition.
{¶ 28} In mid-year 1998, plaintiff submitted sales tickets for each of the five document custody customers acquired in the Bank of Boston/Merchantile Bank purchase. In a June 10, 1998 memo to Dave Vetta, von Kuhn's successor, plaintiff stated that the submitted fees included "strictly new business" and did not include existing files that were purchased by defendant. (Daniel Depo. Exhibit 3, page 2.) Plaintiff further stated that he made sales calls to each of the five document custody customers after the bulk acquisition in an attempt to persuade them to stay with defendant for future flow business. After consulting with Daniel, Vetta decided not to compensate plaintiff for the sales tickets submitted on the five document custody customers. According to plaintiff, the sales tickets he submitted did not include fees for custodial services for the flow of business existing at the time of purchase; rather, the submitted fees represented the additional flow business to be obtained commencing immediately after the execution of the new custodial contracts. Plaintiff estimated the fees based upon the history of monthly activity for each of the five customers during the preceding twelve-month period.
{¶ 29} On March 14, 2000, plaintiff filed a complaint[1]
alleging, inter alia, breach of contract. In particular, plaintiff alleged that defendant breached the 1996 Plan by refusing to pay him the full amount of incentive compensation in connection with the Chase transaction. Plaintiff further alleged that defendant breached the 1998 Plan by refusing to pay him incentive compensation on the new business he secured from the five document custody customers acquired in the Bank of Boston/Merchantile Bank purchase. On April 24, 2000, defendant filed an answer denying that it owed plaintiff further compensation under either the modified 1996 Plan or the 1998 Plan. In addition, defendant filed a counterclaim seeking recovery of the February 1998 $93,379 "trailer" payment made on the Chase transaction under the theory of unjust enrichment.
{¶ 30} On June 1, 2001, defendant moved for summary judgment on both plaintiff's complaint and its counterclaim. Defendant denied that it owed plaintiff any incentive bonuses under either plan because (1) the incentive programs do not constitute valid and enforceable contracts; and (2) assuming, arguendo, that the incentive plans are valid and enforceable, plaintiff is not entitled to additional compensation under the terms of either plan.
{¶ 31} On October 26, 2001, the trial court granted summary judgment in favor of defendant on both plaintiff's complaint and defendant's counterclaim. In particular, the trial court found that the provisions of the 1996 and 1998 incentive plans unambiguously vested unfettered discretion in defendant to determine the nature or extent of its performance. As such, the plans were too indefinite to constitute legally binding offers to unilateral contracts and were thus unenforceable. The trial court further found that plaintiff had no legal or equitable right to retain the $93,379 "trailer" payment because the express terms of the 1996 plan did not impose any contractual obligations upon defendant; thus, defendant had complete discretion to cap plaintiff's incentive for the Chase deal at $500,000. In addition, the court noted that plaintiff had been informed that his incentive compensation would be limited to $500,000 before any payment was made.
{¶ 32} Plaintiff appealed the judgment in favor of defendant and has assigned the following three assignments of error:
{¶ 33} "[1.] The trial court erred when it held that the Bank One 1996 incentive compensation plan was not a contract and did not contain a binding offer even though the 1996 Bank One compensation plan contained a unilateral offer of compensation, which was accepted by appellant's performance.
{¶ 34} "[2.] The trial court erred when it held that the Bank One 1998 incentive compensation plan was not a contract and did not contain a binding offer even though the 1998 Bank One compensation plan contained a unilateral offer of compensation, which was accepted by appellant's performance.
{¶ 35} "[3.] The trial court erred in granting appellee's counterclaim because there is a material dispute of fact as to whether appellant's compensation was improperly capped."
{¶ 36} By his first and second assignments of error, plaintiff challenges the trial court's determination that the 1996 and 1998 incentive compensation plans did not constitute legally enforceable contracts.
{¶ 37} Civ.R. 56(C) states that summary judgment shall be rendered if "* * * the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * *"
{¶ 38} Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. Tokles Son, Inc. v. Midwestern Indemn. Co. (1992), 65 Ohio St.3d 621, 629, citing Harless v. Willis Day Warehousing Co., Inc. (1978), 54 Ohio St.2d 64, 65-66.
{¶ 39} "The moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record * * * which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." Dresher v. Burt (1996), 75 Ohio St.3d 280, 292. Once the moving party meets the initial burden, the nonmoving party must then produce competent evidence demonstrating that there is a genuine issue for trial. Id.
{¶ 40} In reviewing a trial court's disposition of a summary judgment motion, an appellate court applies the same standard as that applied by the trial court. Maust v. Bank One Columbus, N.A. (1992),83 Ohio App.3d 103, 107. An appellate court reviews a summary judgment disposition independently and without deference to the trial court's determination. Brown v. Scioto Cty. Bd. Of Commrs. (1993),87 Ohio App.3d 704, 711. Thus, in reviewing whether a trial court properly granted a summary judgment motion, an appellate court must review the standard for granting summary judgment set forth in Civ.R. 56, as well as the applicable law. Summary judgment is a procedural device to terminate litigation, so it must be awarded cautiously, with any doubts resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356, 358-359.
{¶ 41} In Quesnell v. Bank One Corporation (Apr. 4, 2002), Franklin App. No. 01AP-792, this court recently determined the precise issue raised in the instant case. In particular, we determined that the language contained in the 1998 Plan permitting Bank One to modify, amend or terminate the plan at any time and to disavow any obligation to pay an incentive award to any participant rendered the contract illusory and thus unenforceable. Plaintiff argues that Quesnell is not applicable to the 1996 Plan because that plan contained additional language stating that "[n]o amendment, modification, or termination of the plan, shall in any manner adversely impact an award therefor earned under the plan." Plaintiff suggests that this language somehow nullifies the illusory nature of the contract. We do not agree. This language merely provides that once an award has been approved, no amendment, modification or termination of the plan may adversely impact such award.
{¶ 42} Further, as noted by the trial court, the plans contain other language which clearly establishes the illusory nature of the contracts. In addition to maintaining the right to amend, modify or terminate the plan at any time, defendant is vested with the unfettered discretion to revoke an employee's participation at any time, to determine which employees have the privilege of participating in the plan, to determine which generated fees will contribute to award eligibility, to determine the ultimate amount of any award, and to determine whether any incentive compensation will be paid at all. As noted in Quesnell, the contract in question is "unquestionably one-sided in favor of Bank One" and "provide[s] Bank One with an unlimited right to determine the nature or the extent of its performance." Id. As we concluded in Quesnell, we find that that the trial court in the instant case was correct in finding that plaintiff's claims under a contract theory must fail, as the contracts at issue are unenforceable as a matter of law. The first and second assignments of error are not well-taken.
{¶ 43} By the third assignment of error, plaintiff contends that the trial court erred in determining that defendant was entitled to recover the $93,379 "trailer" payment made under the 1996 Plan under a theory of unjust enrichment.
{¶ 44} In its decision granting summary judgment for defendant, the trial court recognized that "unjust enrichment is the principle in equity which holds that if a person retains a monetary benefit which in justice and equity belongs to another, and if retention of that benefit would be unjust, restitution as a remedy will lie to prevent him from retaining the benefit to which he is not entitled." Decision at 7, citing Hummel v. Hummel (1938), 133 Ohio St. 520; Bank One Trust Co. N.A. v. LaCour (1999), 131 Ohio App.3d 48.
{¶ 45} In the instant case, defendant was informed in December 1996 that his compensation on the Chase deal would be capped at $500,000 and that such cap included "trailer" payments. By November 1997, he had been paid that amount. As noted previously, defendant had complete discretion under the 1996 Plan to set, approve and cap plaintiff's incentive compensation award for the Chase deal at $500,000. In February 1998, he was paid the $93,379 "trailer" payment in error. Under the circumstances, plaintiff's retention of any monetary amount over and above the $500,000 capped amount would be unjust. Thus, the trial court was correct in finding that defendant was entitled to recover the $93,379 "trailer" payment under the theory of unjust enrichment. Accordingly, the third assignment of error is not well-taken.
{¶ 46} For the foregoing reasons, plaintiff's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
LAZARUS and DESHLER, JJ., concur.
[1] Plaintiff's March 14, 2000 complaint erroneously named Banc One Corporation as defendant. Plaintiff subsequently filed an amended complaint substituting Bank One Trust Company, N.A. as defendant.